The first case on our docket this morning is No. 23-40683, United States v. Lazar. Mr. Hunter. Thank you, Judge Richland, and may it please the court. The power to reach extraterritorial conduct for criminal behavior overseas depends upon an important mixture of procedural and constitutional safeguards. It depends upon the explicit grant of that extraterritorial jurisdiction by the Congress. It depends upon authorization for that theory through the indictment returned by the grand jury. It depends on the factual evidence supporting that jurisdictional element as to each count without any artifice or contrivance by the government in having obtained it, and it needs to be tried in a venue that is fixed by law and the Constitution. When the government plucked Marius Lazar out of Romania for criminal behavior that occurred solely in Romania, they ignored all of these fundamental principles, a problem which permeates all three counts of the indictment against him, and that merits reversal. It's been said over and over that without proper jurisdiction, a court cannot proceed at all. It can only comment on the jurisdictional failure and dismiss the case. That should have been done at the motion-to-dismiss stage of this proceeding, and in part, it was. But the government attempted to end around that process by asking the court to entertain a throwaway line, a tag-on statute, 848E1A of Title 21 as an alternative to the fact that one of the predicates that was alleged, a murder-for-hire plot involving a murder of a Romanian national, which of course never occurred, by a Romanian citizen, could not be supported by state law principles, could not be tied into the RICO statute by means of the Texas Penal Code. That was the correct ruling, and of course, that aspect of it was not revisited. But inviting the judge to then say that it could nevertheless be used as a RICO predicate for the underlying conspiracy was a constructive amendment of the indictment that deprived Mr. Lazar of his most fundamental right to an indictment by a grand jury. We know that it is a mistake because, first and foremost, the indictment as written did not give us notice that we were going to have to be defending against a continuing criminal enterprise conspiracy built upon the concept of murder. That was not the way that the government laid out the murder-for-hire allegations in its indictment. We also know that that's not an acceptable means of proceeding forward because it's not authorized by 1961 for the RICO laundry list. If we look at that list of predicate offenses, murder is only reachable through RICO through, I believe, only two different possible permutations. The first is if it's prosecutable under state penal code principles, which we've already established doesn't apply here. Or second, if interstate forward comments are being utilized for a domestic solicitation for murder, which also doesn't apply here. 848 D1A is not in the RICO laundry list. And when we look at what the RICO laundry list says with respect to narcotics trafficking, it doesn't say all narcotics offenses. It doesn't say all Title 21 offenses. It specifically runs through the basic concepts of manufacture, distribution, import, export, possession with intent to deliver, none of which are implicated by a solicitation to commit murder. So it doesn't even have a statutory underpinning within the RICO statute. And we also run into a problem because 848 E1A is a very strange species of criminal statute. And I apologize because as this process has unfolded, I have struggled to find the right word to identify taxonomically this particular species of criminal statute. But it's qualitatively different than most offenses that can be conspired to. Because when the Congress wrote it, we're obviously talking about a statute that authorizes a minimum mandatory of 20 years in prison and authorizes in certain cases the death penalty. It is a very serious capital offense that's being described here. And when the Congress wrote it, they put an important qualifier in the statute, which is the idea that and the death actually results. Meaning it isn't a speculative concept. Someone could have been killed. Or it was the desire of the parties in the enterprise that someone be killed. But that the death actually results, which makes sense since it's authorizing capital punishment. And we look at what Title 21 otherwise tells us about conspiracies and attempts to commit these substantive drug trafficking offenses. It tells us the penalty is the same for the conspiracy as it would be for the underlying substantive offense. We recognize on Eighth Amendment principles we couldn't put someone to death for the inchoate solicitation of a murder that never transpires in furtherance of a continuing criminal enterprise. We recognize that there is no alternative that Congress has authorized us to consider when examining what we would do for such an inchoate as an alternative punishment. And so what we're left with is this offense is substantive. And I've characterized it as a sentencing statute. What I'm trying to get at there is, it is a status offense. It is a crime that is punishable in the way that Congress set forth because you hold the status of being the participant in the continuing criminal enterprise with five or more participants that meets the drug trafficking language of the statute and a death actually occurred as a consequence of that conduct. That's a unique status driven crime. I can certainly conspire if I am already a convicted felon to purchase a firearm and violate the felon in possession of a firearm law. But I don't think any of us would think that it's a sensical way to interpret the statute that I could conspire to go out and become a felon so that I could go out and purchase a firearm in contravention of the law. That would be a very strange way to examine it. But that's functionally the kind of logic that the government is trying to apply to 848 in this case. When you put those things together, it's abundantly clear that the government lost its ability to use that murder for hire as a predicate. They threw a Hail Mary and tried to resurrect it by this throwaway piece of language. And the judge, regrettably, turned a tail from what was the correct ruling and brought that back into the overarching question of the conspiracy. To be clear, are you saying they couldn't have alleged it any way, shape or form under the statute or they could have, they just didn't? I think if we look at all of those things in combination, I believe the correct answer would be that this particular plot to murder someone overseas was not reachable through RICO. What I mean is you couldn't have a conspiracy to commit unless it was actually a murder. I thought that was your point. I think that is one of my points, yes. It seems to me that the way that this particular statute is structured does not lend itself to inchoate application. Because there is no lesser penalty provided by law, the Congress put this unusual language in it about and the death actually results. And the offense is at its core a status offense. Even some of the government's authority in response to this, I believe sort of drives this question home. The government points to V.R.L., and they quote from V.R.L., saying that 848 is an offense which is punishable in addition to and not as a add-on. It is an additional thing that is driven by the circumstance of completed historical events rather than something that can be looked to in the future as conspirable activity. That's my take on this. I don't think that that is essential to a ruling in Mr. Lazar's favor, though. Because even if we say that it is conspirable, we also then have to ask ourselves, is it conspirable under RICO? Because it still has this problem of not being properly described by the Congress in the laundry list. It's not one of the predicate offenses that they lay out. And so we'd be having to say, okay, we reject Lazar's argument that this can't be conspired to. What we're going to have to do now is we're going to have to read it into the laundry list by inference because the laundry list describes some Title 21 conduct. But it doesn't give a blanket grant that all Title 21 conduct is automatically part of the RICO list. So we'd be having to do a little extra statutory work for the Congress on that front, even if it is conspirable. In either event, we arrive at the same result, which is that this was not the right vehicle to keep the murder for hire plot alive as a predicate in this indictment. And the proper way to have given this man a fair trial would have been to excise it completely from the indictment and then proceed on the questions related to the drug trafficking conspiracy and the money laundering by themselves stand alone. The reason the government didn't want to do that, the reason they fought so vehemently for the judge to reconsider, is because without the murder for hire plot, Marius Lazar's involvement in this conspiracy is very thin. We're talking about massively different quantities of drugs between these two groups of people from different nationalities. Every other participant in this conspiracy was from New Zealand. Their only commonality is the agent. And I think that that's a very telling point. The reason why the murder for hire is valuable to the government in this case is because we clearly see from the record that Matthews and Johnson are not paying for Lazar's much smaller request to be paid. And Lazar's trying to acquire Tim. They're not volunteering to pay for that. They're not trying to facilitate his drug trafficking transaction. Where they overlap and where they blend is because Matthews is offering and at one point does contribute financially to the murder for hire plot. So the government wants to make that part of the drug trafficking theory because without it, they don't have sufficient nexus to show agreement between the participants in this crime who legally can conspire. The only person with whom Lazar has a concrete agreement to traffic narcotics is the agent, which he can't possibly conspire with. And Lazar doesn't ever wire any money to the United States. His only financial contribution was a very small payment to essentially show the agent that he had the bona fides to produce more money in the future, which of course wasn't true. Lazar struggled the whole time this was being investigated to come up with any money. That's the only thing they have going for them. So they needed that murder for hire to keep this thing alive. But it just doesn't fit. It doesn't fit with RICO. It doesn't fit with what they pled in their indictment. It doesn't give us fair notice. They went to great length. They tried to say that the mere recitation of the statutory language could be enough to properly apprise us of the situation. They also try to say that we should be put on notice because of things that are done subsequent to the return of the indictment, like proposed jury instructions. But at the bottom line, we're talking about whether the indictment satisfies due process and gives us fair notice of what we're here to defend. And we were of the opinion all the way until we were in the middle of the trial that we were having to defend a murder for hire plot as it related to a Texas penal code violation. We had no way of anticipating that the government was going to use it so robustly to try and bootstrap its drug conspiracy and to make it a part of the list of possible predicates that would have satisfied that aspect of the RICO conspiracy. That wasn't fair notice. I think the record speaks for itself at that point. I was one of three lawyers that tried the case. The other aspect of this that I think is of deep interest, despite the fact that it would be a very rare occurrence, I would strongly encourage the court to entertain, is our argument related to the Archer decision and the idea of manufactured jurisdiction. Because obviously while I think that the murder for hire plot just simply cannot meet the jurisdictional requirements, the pleading requirements or the necessities of RICO to be considered, we still obviously have a drug conspiracy and a money laundering conspiracy. And we only need two predicates for RICO. But every facet of this case that would give the extraterritorial jurisdiction to prosecute the underlying conspiracies or their perpetrators, there was no cocaine. There was no base of operations in Beaumont, Texas. There was no industrial facility where cocaine would be secreted inside of heavy machinery and shipped. There was no purpose in transshipping cocaine to Romania so that it would end up in the possession of people trying to sell it in New Zealand. All of these things were put in place by the agent. And that distinguishes it from other cases this court has passed on when deciding that Archer is not applicable. Garrett being the one I think we've talked about in the briefing the most. But in Garrett, the things that gave the government jurisdiction were preexisting. There was some other reason why the agent lived across state lines or why the telephone number was not from the same area code. And those preexisting features gave us a reason to say it's not a pure artifice. It's not a contrivance. This isn't some cute way of trying to manufacture it. None of that's applicable here. Because all of it was made up. All of it. And specifically to me the thing that is the most absurd about this particular set of facts is that it really preys upon the ignorance of the foreigner as to why it would even be necessary. Sitting at thinking about it from the perspective of an American, why on earth would you want cocaine being sourced from South America to first come to the United States before it gets shipped out to Romania and New Zealand? There's no logistical sense. And while the agent proffers some logistical reasons for those things, those are also contrivances that he made up. The government might try to say, well, Johnson and Matthews very clearly wanted it to go through Beaumont because of this idea of it being secreted and having machinery. And they'll lean on that aspect of the record to say that that's the preexisting condition. That it is under contrivance. But the only reason that they're amenable to that and supportive of it is because agent Diaz told them that it was a necessity in order to get the cocaine to them. Again, he's in control of all of the cards for this fictional universe, this fictional cocaine. And that smacks of something that is just manifestly unfair. And for that to be the thing that allows us to latch on jurisdiction to prosecute people who had no intention of doing anything to violate the internal safety or viability or laws of the United States is absurd. I mean, this is not Alcazar. This is not Wilson. This is not a situation where these were crimes that ultimately were intended to harm our citizens, our people, our interests at home. No American was at risk of having acquired any of the cocaine that was hypothetically being discussed in this trial. This had nothing to do with anything. The only reason anyone was involved at all, the only reason I can see why the DEA would even want this case is what I call a Nigerian prince scheme. We're just trying to get money from these foreign criminals and acquire it. And that's the objective they accomplished. But there isn't any American interest being served by prosecuting these people other than to steal their money. So I think that that's the structure there. The other thing I think is very significant here and its fundamental, the murder for hire predicate is once we recognize the issues of manufactured jurisdiction and sufficiency as they relate to the drug trafficking conspiracy is this question of venue with respect to money laundering. The government will take the position that Alcazar first landed in the eastern district of Texas. That's the end of the story. The special venue provisions for money laundering are permissive. They're not mandatory. But this is an extraterritorial jurisdiction case. And that's the secret sauce that makes this different. We're not talking about what happens for a domestic money laundering trial. We're talking about a situation where the only reason we have jurisdiction to prosecute the money laundering at all is because there was an overt act in furtherance committed on American soil, meaning money was wired to American banks by the New Zealanders, not Alcazar. That's their tie in. That's a jurisdictional element of the case. When that triggers, I don't see how we can pretend that we still get to resort to permissive venue decisions. Because we have these principles about overt act in furtherance baked into the money laundering statute, both for conspiracy itself and in the venue provisions of subsection I. And when we examine that, the crime was not begun overseas or elsewhere. The crime was begun when an overt act was committed in the United States. And we no longer then get to the permissive concept. Now we have to look at the overarching position. I believe I may have gone over my time. So thank you all very much. Your clock is showing 4.07. It's going up. I thought it was going down. I will reserve what very little time I have left for a very short rebuttal. Thank you. Good morning. And may it please the court, Christopher Rapp for the United States. I want to start the issue we just heard most of opposing counsel's time being spent on. And that's the 848E1A issue and its allegation. How it was alleged in the indictment. Government pleaded the indictment. The grand jury returned a true bill on this in statutorily the only way. 848E could have been pleaded under the racketeering act. Section of the code 1961A, as counsel correctly identifies, only permits murder as predicate racketeering acts in violation of state laws. However, subsection D is where we depart. That specifically permits dealing in narcotics. Therefore, 848E1A is a federal narcotics offense. 848E1A only covers conduct that does not, it does, I'm sorry, there's no conduct it covers that does not involve one, a murder, a connection with two, drug trafficking. Counsel, do I understand in working through not only the indictment, but also the district court's rulings on this, do I understand that the government at some point prior to trial changed its theory of the underlying predicate acts? No. Is that a fair statement? It's not. Okay. It is not. If you would, explain to us the district court's ruling, initial ruling, why it was incorrect and the subsequent ruling that was in your favor. Absolutely. So as it was pleaded, there was money laundering offenses, drug trafficking offenses, a list of statutes associated with that, and a solicitation to commit murder under state law, under the 1961A provision. And then the RICO, the 1961 section includes attempts and conspiracies, so inchoate acts to do a variety of covered offenses. Initially, the court's ruling based on the defendant's motion was they were going to strike the state violation of the state of Texas' murder law for solicitation, saying that that offense was pleaded in Romania and had not reached the state of Texas. In the initial pleadings, the government argued in the alternative that if the court were to do that, 848E1A survives. The court initially found that unavailing, and we lay that out, both sides in this case lay that out in the pleadings. The government then filed a motion to reconsider and prevailed on that. And here's the reasoning, and it takes a bit. So what the court initially confused was categories or types of predicate acts and acts themselves. So the money laundering offenses, the narcotics offenses, there needs to be two acts to violate the racketeering laws, and here this is a racketeering conspiracy. So come back to this, but the crime is agreeing to do these things. Completion is not required. That's heart and soul of the Salinas decision from a unanimous Supreme Court. So if completed, so contemplating and agreeing to the acts is the crime, not completion. Therefore, when we look at acts and not categories, we have to prove two acts of money laundering or two acts of narcotics offenses. Could be one of each, could be multiple of each, acts, not types or categories. So when we look at acts, 848E1A is a narcotics act. It is only chargeable under federal narcotics laws. So therefore, it was pleaded and indicted properly, and that portion of the indictment survives. That is statutorily mandatory. So is it a red herring to consider the murder for hire as a predicate act? It's a predicate narcotic act. It was pleaded as a narcotic act. Yes. It's a narcotic act as part of a narcotic offense. It has a special provision about murder, and that's the wrinkle in it. But every narcotic act in the indictment, there's an importation act, an exportation act. The federal government has a right to do all of that. Each and every one of those are narcotics acts. Can you explain your theory of why it was part of a narcotic act? Because 848E1A is a federal controlled substance offense. That's the only way it can be anything is a narcotic act. It's just statutorily. But how is it part of this indictment? Sure. They were all, as a group, looking to traffic drugs. That's what was pleaded. That's what they were convicted on at trial. What would help them traffic drugs is to murder rival drug dealers. Therefore, all these drugs we're going to get from Peru through Beaumont, Texas to points abroad to Romania and New Zealand, there's not rival dealers in Romania. We can get yet more drugs and sell yet more drugs and make a lot more money. And that's alleged in paragraph seven of the indictment itself. The speaking form of the indictment, when they're talking about the murder setup, murder kind of sale, if you will. And it refers to both intended murder victims as members of both drug traffickers and members of a rival motorcycle gang. So what this means is they're intermingling. The drug trafficking with the enterprise activity associated with the Hells Angels means the drug trafficking is an act in furtherance of the enterprise. So we have a drug trafficking conspiracy, an 848E1A act in furtherance of that conspiracy, an ERICO conspiracy. All of that is evidence in furtherance of what was pleaded. Paragraph eight of the indictment goes even further, simultaneous to the murder for hire. Mr. Lazar, the defendant, is discussing kilogram, 10 quantity kilogram deal with the agent. So it's all intermingled and interwoven. And that's the nature of the evidence that establishes the enterprise establishing, establishes the predicate. I'm sorry. How does that connect with the other members of the conspiracy? Sure. So factually what happened was Mr. Lazar was unknown to anyone until the co-defendants from New Zealand traveled to meet with the agents in New Zealand, or sorry, in Romania, in Bucharest, Romania. They had a dinner and the next day, Mr. Lazar suddenly is reaching out to the agent like, hey, my buddy's told me about you. You know, I hear you're a big time, you know, cartel type, something of that nature. That's where the murder solicitation happens. And in concert with that, they, he asks for some drugs as well. Then they agree to intersperse it with the other, the other ones. Matthews, co-defendant, is calling the murderer a must. He was a threat to the drug business. This is at the record at 4639 through 45. Matthews offers to help pay for the murderer. That's at 419. The cocaine was to be shipped in the same container, 2134 through 35. When they met later, Mr. Lazar himself, they're discussing how they're going to pay for the drugs they ordered. Mr. Lazar, not prompted, just on his own, brings up this town in Bulgaria by the name of Selestra, indicating that other Hells Angels members from Bulgaria and Selestra may be able to help get the money smuggled across the Bulgaria remaining border to pay for the cocaine. So what's happening here is Lazar is acting in furtherance of the existing narcotics conspiracy. He's intermingling his business so we have one conspiracy. That's what was litigated at trial. That was the argument in both the legal setting that the district court within its discretion rejected. It was argued extensively to the jury. The jury rejected it as well. And there's sufficient basis for the jury to make that finding given how interwoven all the narcotics trafficking among all the co-conspirators was. Legally on this, the court is well within its jurisdiction to treat subsection of this statute as being a substantive offense. There's no reason to treat 848E1A differently. When we hear this phrasing that it's a continuing criminal enterprise offense, the government's view is that's misplaced. Continuing criminal enterprise is a form of a crime under the 848 statute. It is early on in the statute. Only once you get down to subsection E do we talk about murder and furtherance of drug trafficking. So that's the crime before it was indicted. It was pleaded in the indictment. It was before the district court convicted on, jury convicted on and was reasonable in doing so. Snow out of the 6th circuit took Villareal from this circuit and relied on it to hold that an 846 conspiracy can have 848E1A, the charge here, the predicate act here, as an object of a conspiracy. So if it's proper for this to be an 848 domestic conspiracy under 846, it is certainly proper for it to be an object of an international conspiracy under 963. And in fact, 848E itself, before we get into the subsections of A and B, references 960, which is the sentencing statute for the international offenses. So did Congress authorize jurisdiction? Absolutely. It authorized jurisdiction. The reach of RICO, extraterritorial, best case on that for you all is Vasquez out of the circuit. It says no question, there's no question based on Vasquez that 848E1A applies extraterritorially at least to the extent the underlying offenses do. These underlying offenses is well established. There's extraterritorial jurisdiction for the narcotics offenses alleged as well as the money laundering offenses alleged. Unless there's any questions, I'll move on to money laundering and jurisdiction related to that. So under Whitfield, the Supreme Court passed a bill about the venue statute within the money laundering within 1956. And that's 1956I. And it held that it supplements rather than supplants the default venue rule. And here title 18 United States code section 3238 is the default venue rule. For offenses committed on the high seas, it is first brought. Mr. Lazar, the appellant was flown extraterritorially, landed in the eastern district of Texas and first appeared in the eastern district of Texas. That is an application that is lock and key for the default venue statute. Williams out of this circuit, 3238 applies in a first brought case even if venue would be proper elsewhere on a different basis. So applying Williams to the argument you just heard tells you to reject the argument you just heard. 3238 is proper even if there's another way to do it. 1956F is a jurisdictional statute, not a venue statute. And this conflating jurisdiction and venue is the flaw in the argument you just heard. There was wire, there was money from the New Zealand side wired to the United States. To a bank in San Francisco and a bank in Houston. Because that's an overt act in furtherance of the money laundering conspiracy. Jurisdiction is proper in federal court in the United States. It could have been wired to Guam, it could have been wired to Puerto Rico, Maine, anywhere in the United States now has jurisdiction. Because the plane landed in Beaumont, Texas, or actually Nederland, Texas, kind of close to it, and was first wired to Guam. However, this entire thing is a conspiracy. Whitfield is the, an overt act is not required under Whitfield, Supreme Court held, and money laundering as a racketeering predicate. It doesn't have to be completed. It just has to be agreed to. That's Salinas, a unanimous Supreme Court held that in the seminal Rico conspiracy case. Couple other, I want to talk just a touch about, use the term manufactured jurisdiction. That entire argument is manufactured jurisdiction. It's not a good law at all. It's been severely limited, severely disagreed with by pretty much every other court that's addressed it. Wallace out of the second circuit, it says courts have refused to follow Archer when there's any link between the federal element and a voluntary affirmative act of the defendant. And here the cup runs over with a voluntary affirmative acts of the defendant. First, in the conspiracy, because this is a conspiracy, so conspirators doing things on their own is what gets us there. The informant in this case is the one who first contacted the undercover. That's how the connection started. It isn't the agent creating it. From there, a co-defendant who was in jail in New Zealand reaches out to the undercover agent. The co-conspirator in jail brings up the United States. He says the machine should come from the U.S.A. The purchase is made from the U.S.A., not the U.S.A. The co-defendant says it's best for the cocaine to go to the U.S. first. That's at 2011, 3596 as well as in trial exhibit 6D2. And hundreds of thousands of dollars were wired or attempted to be wired in this, in the appellant's case. So he may not have been able to pull it off, but it wasn't for a lack of desire. This was the height of COVID and getting into a bank in Romania with proper swift codes proved to be a task too tall for him. But it wasn't because he didn't want to send the money. He didn't want the money to go to the United States. The district court was proper and cited Clark out of this circuit, defended it voluntarily in his own free will. Did the act that caused the interstate element to exist. Quoted Clark in rejecting that idea at the district court. And under, even under a de novo review, district court was well within its discretion and correct in arriving at that ruling. I see my time is limited. I don't want to leave any issues hanging because there's many of them. So if the court has any other questions on any other issues that I can address in the last little bit here, I'd be happy to do so. Thank you, counsel. I think we have your argument. I appreciate it. Thank you, judge. We ask you affirm the conviction and the sentence. The thing I think is most important to drive home here when we look at how the district court approves the statutory 848 argument is they are assuming that the language of the laundry list authorizes 848 to be included even though it's not enumerated by statute. And the way that the laundry list describes narcotics trafficking offenses describes certain classes of narcotics trafficking. Specifically things related to the import and export of controlled substances, possession with intent to deliver. It doesn't say anything about killing in conjunction with those offenses. The phrase any laws of the United States is a modifier that relates back to the subset of the types of drug trafficking offenses that the laundry list lays out. There is no explicit statutory grant within the RICO statute for 848 to be a predicate. The statute is not a predicate. I think that's the most important takeaway from Abel counsel's argument. There wasn't, I think, judge, you asked whether something was a red herring. I think that the red herring we dealt with at trial was there was a lot of discussion about whether it's individual acts or it's categories or types of conduct that can form the predicate. I think all of that discussion is meaningless and not necessary to this case. That's the red herring. The issue is whether or not 848 can be a predicate under RICO for these purposes. I talked to you as well about the ARIAL. The ARIAL, again, recognizes that just because it's a stand-alone crime and just because it is not a sentencing statute does not mean that it's a stand-alone crime. It's a predicate stand-alone in its own right. And it does not mean that it explicitly can be conspired to. Abel counsel mentioned United States v. Snow. I think if I heard him, he was saying that it's actually interpreting the same specific subsection that we're talking about here. I don't believe that's correct. Snow was addressing E1B, which is a similar statute, obviously, but it's not the same. And it's only asking that in the context of 846. But if you go and you look, here's where this gets really interesting. If you look at all the cases that have talked about 848E1A, we're talking about cases in which there was a completed murder. Someone died while the continuing criminal enterprise was occurring. The question of whether you can prosecute someone for the conspiracy independently is a separate question. It's tied up in the questions of jeopardy. It's tied up in questions of what did the Congress authorize. How much does the Congress want to carve the conduct out? Those are not questions for this case. That isn't what's being disputed here. The question is, how is it applicable in a situation where it is a purely inchoate from start to finish? It never results in an actual killing. When the Congress put that language and baked it in, they don't have to bake that kind of language in. They never do. So, I mean, basically everything the government can rely upon is asking you to treat all of the statutes at issue here like they're just interchangeable parts. Just going back to our first principles, well, I know that conspiracy can apply to almost every crime. I know that these generally can be carved up into completed, attempted, and conspired. Those general principles are fine, but this is a very unusual statute. That language means something. It's not enumerated. And the killing actually results, means something in the context of the statute. I don't think that we can ignore that. We certainly can't ignore that it's not enumerated in the RICO statute. With respect to the venue provision and money laundering, what I want to drive home here is that, again, this goes to the problem with having to extend these crimes out, extraterritorially, to people who were trying to commit crimes in a foreign country that had nothing to do with the United States. When you're trying to stretch these laws that far from our shores, there are consequences to it. One of those is that if I'm laundering Romanian money into a Romanian bank, the United States is not concerned or implicated in that. We need something overt, in furtherance, that occurs on our soil or touches our soil before we get to interact with that. That changes the character of this, even for the purposes of conspiracy. The fact that under subsection H, laundering doesn't require an overt act makes perfect sense if we're talking about domestic money laundering. But if we're going to try to reach this kind of conduct, which otherwise the Congress wouldn't want us to go after, we need to have a transaction that touches an American bank. That's when the crime occurs. In the traditional formulation of a conspiracy, we need an agreement and an overt act. Congress oftentimes forgives the overt act requirement, like it does in drug trafficking, like it does in money laundering. But when there's a jurisdictional thing to hang its hat on, and we have a statute for venue within the money laundering law that specifically talks about these overt act requirements, about conduct that actually occurs in the United States for non-U.S. citizens, I think that we have to honor that. Your time has expired. Thank you so much. Thank you. Thank you.